and with that we'll kick it off with 25-20020 Allstate Indemnity Company v. Bhagat and apologies if I mispronounced but you can correct me. Alright, one for one. Mr. Krosno, whenever you're ready. May it please the court, counsel, my name is Wade Krosno and I'm here along with my co-counsel Laura Sherry on behalf of the Allstate Appellants. I have a few key points that I hope to cover in my limited time today. I will summarize them first and then address them in more detail as time and as the court permits. First, the district court conflated RICO mail fraud with common law fraud which in turn led it to conclude that the RICO claims could be dismissed for failure to adequately allege reliance. Both conclusions are directly contrary to Supreme Court and Fifth Circuit precedent. Second, RICO claims require proof of proximate cause rather than reliance. Allstate adequately alleged a direct relationship between its injury, the inclusion of amounts for fraudulent medical bills and settlement payments, and defendant's conduct in generating those bills and forwarding them to personal interest. So what is your best evidence that the causal chain here is direct and not attenuated by the attorney's settlement discussions but direct? Well, it was direct in the same sense that it was in the Allstate versus Planbeck case where the entire object of this scheme was to generate medical bills with fraudulent charges in them and then to forward them to the attorneys and then to have those attorneys forward them in settlement demand packages to Allstate. And so it went through the attorneys but the direct purpose of the scheme was to get Allstate to pay up as this court put it in Allstate versus Planbeck and that is adequate to allege reliance. And there are several other district court opinions we've cited in our brief where similar allegations, similar RICO allegations, similar type of schemes, settlement payments being made by the insurance company were found to be adequate by the district courts in the State Farm versus Meeser case, for instance, in the State Farm versus Complete Pain Solutions case. And this action was filed in 2024. I note that Allstate took a deposition of Dr. Bagat in 2022. What was the basis for taking that deposition? Well, it was in May of 2022 and it was to explore the reasonableness of the defendant's medical charges in that case. And it also became a basis for, you know, ultimately for determining that this entire scheme and course and scope of payments was fraudulent. But at the time it was a discovery deposition but there were obviously questions that were asked about some of the practices that were issued here. That deposition was taken in May 2022. More than half of the settlement payments had already been made before then. And as we argue in our brief, that deposition should not have been considered by the district court at all in its 12B6 analysis because it was not attached to our complaint. It was referenced a couple of times in our complaint but it was hardly central to the complaint. And then the defendants attached the entire deposition transcript to their motion to dismiss. And from that the district court drew a conclusion that Allstate was aware of the fraud. But asking questions doesn't demonstrate awareness of the fraud, particularly when the deponent denies knowledge or denies knowing the answer to the questions. And in any event, it wouldn't justify dismissing all of the claims here when many, many of the claims had already been paid at that point. Now, the third point I want to make here today is that Allstate's damages theory does not require speculation about what would have happened in a hypothetical world where Allstate discovered the fraud and did not include amounts for the medical charges in the settlements. It is defendants' defense to that damages theory that requires speculation about hypothetical settlements that never occurred. Now, perhaps they can raise those issues in discovery and at summary judgment or at trial and perhaps they'll get some traction with that. But our damages theory is based on the amounts that were actually paid in the settlements that actually occurred and does not require speculation about what would have happened if we had discovered the fraud, which Allstate did not. You allege a pattern of unnecessary scans and inflated codes. What exactly, you just mentioned the word fraud, what exactly makes those misrepresentations false or fraudulent rather than just a disputed judgment about medical necessity? Well, you have to look at the pattern of 635 different claims where the pattern was repeated. The treatment did not meet the definition of emergency care, which was the only type of treatment Memorial Heights was licensed to provide. We've gone through in detail in our complaint, you know, pointing out that people came in days and weeks after the accident, which that they did not report injuries at the accident scene. They did not show up in ambulances at this emergency center. And so it was an entire accumulation of all that evidence, which indicates that there was a scheme that was occurring here to funnel people in for treatment that were referred by personal injury attorneys that the defendants had letters of protection with, to get them in, to provide unnecessary treatment, to generate bills, and then to have those forwarded to Allstate ultimately for payment. In Appendix A to your complaint, which is considered with your 12B6 motion, I'm sorry, the 12B6 hearing, because it is attached to your complaint. Yes. 635 separate claims. I noticed quite a few of those were repeat offenders, no pun intended, law firms that repeatedly brought clients. Which was the leading law firm? How many? What's the total number? Do you remember? It was 139 of the 635 were by one law firm. And I apologize, I'm trying to summon the name of the law firm. Oh, that's all right. It's definitely stated in our brief that one of the firms had 130-something claims. So there were a number of law firms that were sending large numbers of clients. And you mentioned that one of the persons to get emergency treatment traveled 92 miles. What was the leading mileage, do you recall? I think that's about, I think that, my recollection is it was somewhere in the 80 to 90 mile range. And that people were also driving themselves in and driving long distances from outside Houston coming in or driving past many other hospitals and emergency care centers to reach this one hospital for treatment. So it's a combination of things that we allege, of all those things that we allege indicates a fraudulent scheme that was directed at Allstate. Now the dismissal with prejudice precluding your filing an amended complaint, which is generally allowed the first time around with a Rule 12b-6 dismissal, the only basis that appears in the judge's order dismissing the action is the large number of claims and would not be possible to handle all of them in a single case. Is that your impression as to his basis for denying leave to amend? Because you requested it in your response to their motion to dismiss. We did and the normal course of things by far is for leave to be granted at least once or for the court to explain why leave would not be allowed. In reading the district court's opinion, I did not pick up that. I did see that reasoning at the end. I thought it was just another basis for dismissal. Well arguably it is. That's my question. So that was not an argument that was raised by the defendants and so it's not an argument that we had notice of or an opportunity to respond to. If it had been raised, we would have said first of all that the district court didn't cite any case law or rules that would allow that sort of dismissal based on manageability. The defendants in their brief have cited a couple of rules that as we pointed out apply to joinder of parties more than joinder of claims. One of them, Rule 21, explicitly says that it's not a dismissal, a basis for dismissal of an action. So we don't think those were legitimate grounds. We pointed out that in Allstate v. Flanbeck, there were a similar number of claims that were applied to a jury for a jury verdict and then appealed to this court and the judgment was affirmed on appeal. So these sort of RICO cases are often big, complex cases, but unmanageability we do not believe is a legitimate basis to dismiss them. There are certainly case management tools that the district court could have employed to try to, to the extent there was a concern about manageability, phased discovery, phased summary judgment motions as happened in the State Farm v. Complete Paying Solutions case would be an example, but an outright dismissal and one with prejudice and without leave to amend was not appropriate. Well, it's not one of the four or five bases we state are a basis for denying leave to amend. That's the number of claims is not one of those elements or bases. It is correct and the other elements that could have potentially been cited by the court were not. And so we were entitled to notice of a legitimate basis to deny leave to amend or in almost all cases, we were entitled for leave to amend. Did you ask for leave to amend? We did in our response to the motion to dismiss. I believe it was, and that is cited in our brief that we did ask for opportunity to amend. So I've got just a couple of minutes here. On the RICO causation issue, our basic point and I don't want to beat a dead horse on this, but the district court seemed to believe that under RICO and under Bridge, we were, all state was required to allege reliance and not only reliance, but first party reliance. That is contrary to what the Supreme Court said in Bridge, what this court said in Flanbeck. And so the inquiry was proximate causation, which the Supreme Court said in Bridge is a flexible inquiry that does not lend itself to rigid rules. So it seems in Mr. Bogat's brief, they move away from the reliance piece and go to proximate cause. Part of that argument, I think, is that, well, you say the inflated bills or whatever caused all state to pay too much in settlement. Their view, part of their argument is, well, we can't really know what all state would have paid. I think this is a variation of what Judge Willard asked you. So we can't know what they would have settled these claims for had they known about the inflated pieces. If I understand your argument, the premise of your argument or your case is that those inflated pieces means that all state should have paid nothing, right? For those, because they're fraudulent, effectively. And so what do you say to the argument that, well, all state might have paid a little bit for them? What's the response? Well, I'm not aware in any sort of fraud case where of the requirement where you have to show what would have happened if you had not been defrauded. All we can do and know is show what did happen because we were defrauded. And again, in the Plainbeck case, for instance, the defendants were allowed to bring in some sort of that evidence at trial. Yeah, that was going to be my follow up. Maybe could they, would your view be they could come back at trial and say, well, yeah, there might have been this inflated piece of it, but these services were provided. And they can try that or you would have settled it anyway. Or, you know, you might have paid out more in defense costs ultimately or judgment. And I think they can try to bring in that sort of evidence. But it's at the trial stage or at the summary judgment stage. It's not at the 12 v. 6 dismissal stage. Thank you, Mr. President. Thank you. We'll see you back on rebuttal. Mr. Humphrey, welcome. Thank you, Your Honor. May it please the Court. So, first, my name is Brian Humphrey. I represent the appellees in this case. And just to, obviously, there's way too much to go over in our 20 minutes we have here. But first, the appellees requested and the district court granted dismissal of multiple grounds. Of course, it's a reminder that this court need only find, agree with one ground for affirmance. What's your strongest ground for affirmance? I think our strongest ground is the failure to allege any actual misrepresentations, followed shortly by the reliance issue, Your Honor. Oh, you're not conceding that reliance is not required in a RICO case? Well, I should rephrase that. Causation is required. And the only mechanism of causation, but for causation, is reliance under the facts here. So, okay. I didn't get, I didn't understand from your brief whether you were conceding that under bridge and those cases that you don't have to plead reliance in a RICO mail fraud case. Right, right. Even in our filing below, our attack is on the causation issue and reliance has the mechanism of causation. And the bridge case makes that very clear, Your Honor. So, the bridge case makes clear that... So, is that yes or no on the reliance is not required? Reliance, per se, is not required. Okay. But causation is, and if you don't have any other mechanism, then you would have to show reliance in that case. Your Honor. And there are really three grounds we're going to talk about. That's one of them. The first was the lack of any factual, actual misrepresentations. Second, also being failed to allege any plausible mechanism of actual but for cause for its injury, and facts seem to disclaim the need to prove that here. And third, they failed to allege any actual non-speculative measure of damages. Non-what? Non-speculative measure of damages. And regarding the relief request, requesting that the dismissal be affirmed, regarding the lack of leave to amend, as Judge Willett pointed out, they did not actually ask for leave. They only asked for leave in the body of their responsibles. Most courts have held more than once that a mere request for leave in the body without any specified grounds under 15A is not a sufficient request to preserve that right. They filed no post-judgment motion asking for leave, nor did they take any opportunity to ask for leave before the dismissal. So first, with regard to the mail fraud credit, of course, it's well settled that Rule 9b applies to this. Its essential element of RICO is a pattern of racketeering activity. The only one enumerated here is mail fraud. I think one thing that the 75-page complaint attempts to do is engraft other state law violations onto that credit requirement. These are not RICO credits for when they complain about an additional charge mask, or they complain about the exceeding of the scope of the license to run an emergency room. These are not RICO credits. In fact, the Supreme Court has rejected the idea that you can simply engraft state law violations onto mailing and make that mail fraud. You have to actually have the elements of mail fraud under the federal statute. Which elements do you contend they don't meet for mail fraud under the federal statute? The use of the mail to execute a scheme to defraud requires some actual misrepresentation to be made. Some actual what? Actionable misrepresentations to be made here. Well, aren't the misrepresentations allegedly the very amounts claimed? Well, an amount claimed is simply the amount they are billing. That's not by itself a misrepresentation of anything. That's the amount they bill. In fact, what the emergency rooms generally were, a bill with codes and medical records. What was that code? CDT or something? CPT. And what does CPT stand for? Sounds for something procedural. I actually don't remember. You don't remember what CPT stands for? CPT itself specifically. I know what it represents. It's a code specifying a procedure that was done under the... It's an emergency procedure, isn't it? That's correct. And isn't that the whole basis of this case, that these really weren't emergencies? Well, these were care provided in an emergency room. They could fill that in for that purpose. Anybody can come to an emergency room. That's correct. And routine care is provided in emergency rooms all the time in this country. All the time. But if it's miscoded, it's plausibly fraud. Not if the facts underlying this, the diagnosis, the idea that they were misled as to the condition here is just simply not true. They allege that they received the records and the bills. The records disclose the complaints, the diagnoses. And there is no allegation anywhere that those complaints are not true. That the records don't correctly or accurately reflect the conditions with which the patients presented the complaints they made. And they had all that information. They can draw their own conclusion as to whether this is an emergency or not. Whether it's an emergency or not is a medical opinion made by the treating provider. That by itself is a subjective opinion made by a professional. And they wanted to draw a different conclusion. I mean, we're not trying facts here, right? If it went to trial, you could try the facts and say, look, there was nothing fraudulent about the representation that it was an emergency in this case or that case. But while we're here at the 12B6 stage, we're just talking about allegations. You may have a perfectly plausible defense on every one of these 635 cases. But all we're talking about is the allegations. And I thought the allegations were this knowing misrepresentation of the kind of treatment that was provided and of this gravity of the cases that were presented that didn't merit the highest CPT code. Well, they have an alleged particularity. And if the allegations themselves negate that conclusion, then 12B6 is appropriate. And there's two conclusions in there. One, that the condition was an emergency or not. First off, they had, for everything in their complaint, accurate records showing this is what the complaint was. This is what we observed. This is what we did. There is no allegation anywhere in the complaint that these records don't show that accurately. That there was a treatment given that was not actually given to the patient. That there was a condition that was not actually presented with. Or there was a complaint that was not actually made. The only conclusion they're making is this should not have been an emergency code. They had all those underlying facts to draw their own conclusion. Which they do. This is what they do for a living. This is what Allstate does. They adjust claims. They take evidence. They look at it. And they decide what they think is worth it. So are you making a causation argument that Allstate should have, if there was a problem, Allstate should have realized it during the settlement process? Is that what you're saying?  This is the settlement. These are all settlements. And again, I think that Allstate would like to characterize this as Allstate paying out claims. Like it's a first party insurer. These are all unliquidated, disputed settlements of personal injury claims. Court claims that are settled in a lump sum in an arm's length negotiation between two sides that are represented by counsel. And have experts. Every single one of them. These are all personal injury cases. They're not health insurance cases. Are you saying, I mean, is the upshot of this argument is that you could not have a RICO mail fraud case that is based on this scenario where allegedly fraudulent medical claims are submitted as part of a settlement process. Settled. Then the insurer says, oh, we realize now that the basis of these settlements was false. And so we're going to allege a mail fraud conspiracy. Is that what you're saying? Yeah. None of these facts in this case. Plan B is a little bit different. How is Plan B different? I notice Plan B is cited an awful lot. It is. Plan B, the facts are not similar at all to this case. What happened with Plan B was, Dr. Plan B was a chiropractor. He had, first off, he had telemarketers who called out to the people injured in the car wrecks. Brought them into his clinic. Then his chiropractors sent them for treatment. The only treatment that was considered actionable in that case was x-rays, which had no medical value because they were unreadable and had markings that were gibberish. Those are the only claims in Plan B where the jury found for the plaintiffs. Yeah, but it went to trial. It went to trial. That's correct. We're talking about, that's not a 1226 case. We're talking about the evidence of trial versus hearing. We have no allegations even rising to this level. And then, I think critically in that case, Plan B set the demands. Plan B had lawyers in his building that he funded. And his employees simply put the demands on the lawyer's letterhead and he sent them and he got the checks. His organization did. There's nothing between Plan B and Allstate in that case. Here, what Begat did, they didn't go out and call people. They received, allegedly received, lawyer referrals. They treated patients. They generated a bill of records. The lawyer, there was no allegation, or could there be, that the lawyers are controlled by Begat, like they were in the Plan B case. Negotiated settlements over which the employees in this case had no control over the settlements. And then the lawyers received the money. That's far more attenuated than the Plan B case. Plan B essentially had a chiropractic practice law. And he was, in fact, indicted for perjury for it. This is completely different from that case. This is one provider whose bills were used among other providers' bills along with other elements of damages in a demand to settle an unliquidated tort claim between two parties who are not in here, neither the underlying defense nor the plaintiffs or parties in this case. So that's what's different about this case. I don't think it can be made under these facts. We just have a provider issuing a bill and that bill is used somewhere else. Explain the theory the district judge used for some sort of intervening, superseding cause, if that's the correct term. And was that raised by you as a defense in your 12b-6, or a claim in your 12b-6, or an issue? I don't recall if we used the term intervening cause, but the theory was raised. Well, he did use the term intervening in his order as one of the bases for dismissing the complaint. Correct, Your Honor. And I think the intervening cause, as he put it, is this negotiation of a settlement between an arms-length settlement between parties represented by counsel, not controlled by us, not controlled by the appellees. And again, negotiating a settlement that's a lump-sum amount that also it's alleged they've internally allocated some of it to medical bills. Sometimes they've internally allocated more than the entire settlement to medical bills. And that, I think, does break the chain of direct causation required on the hand. Did you raise that as one of your bases for the dismissal of the complaint, or was that sua sponte by the judge? It was not sua sponte, Your Honor. It was not sua sponte, Your Honor. It was raised in our motion to dismiss the fact that this chain of causation is broken by the settlement negotiation of this unliquidated claim set up. We can't tease out the amounts of these bills from this lump-sum settlement which were policy-oriented settlements. I think that goes to one of the issues here on causation, which is... Was there a settlement conference in all 635 separate claims? Settlement negotiations? There were some. They were all actually been presented by plaintiff's lawyers. Because usually when you submit a claim to an insurer and they take out the copay and pay the rest, but all 635 claims had these settlement negotiations? These are not health insurance claims. There's no copays here. These are auto insurance claims. And I think, yes, there is. The claims being settled are the tort liability of all states' insurers for negligence causing a personal injury which includes numerous elements of damage including medical expenses, lost earning capacity, pain and suffering, mental anguish, physical impairment, physical disfigurement under Texas law which governs all the claims that were settled. So this is just one part of one element of damage that was settled in a lump-sum, not an itemized settlement. That's obvious from their pleading and simple personal injury practice,  so yes, whatever happened was rolled up into this settlement and it's a settlement of a disputed case which, again, we discuss this in our brief. The entire policy of the courts is to encourage settlements of claims. They're settling a claim. They want to go back behind it. They don't want to give back the release they've received for these payments. Instead, they want to go they don't want to renegotiate the settlement. They just want to toss something back. Something that they arbitrarily decided without allocating these payments. There's no allegation that any plaintiff considered that they would have accepted less or that they would have saved money if they went to trial. I don't think they could allege that. And I think that's an important thing here with the reliance issue, or sorry, the causation issue, is it's not just a direct relationship test. Causation requires both but-for and approximate cause. And Allstate, in its reply briefing here earlier, was essentially disclaiming the need to measure its damage against a counterfactual. That just simply disclaims the need for but-for causation. The entire idea of but-for causation requires a counterfactual. In fact, in civil rights cases, we're instructed we must answer the counterfactual. What if the plaintiff or wife here, we must answer the counterfactual. What if the fraud didn't happen? The alleged fraud didn't happen? They don't do that. And I think they make very clear, they crystallize their point not very clear from their complaint in their reply brief that we don't need to do that. We simply have these settlements that we negotiated and we allocated some of it internally. We didn't tell anyone else what it was to this bill. We want that money back. That's not even an injury. An internal allocation of part of a lump sum settlement, who cares how they allocated it? If they can't show that they would have saved money, if they can't show that they would have spent less, that's an injury. That's a cost. It has to be an injury to business or property. That's what's required for a civil rebate case. A mere internal allocation of a number is not an injury to business or property. They have to show and plead that they would have spent less on these claims but for what they allege the appellees did. They don't do that. They can't do it. Because really, what could they be closest they could really come to a non-speculative damage model against one they don't allege is 635 cases within a case. Let's try 635 car wreck cases, see how the jury would have come out with that. Oh yeah, also we need to add in the litigation costs for each one of those 635 trials and then measure that against what they pay. That would have to be less. I don't think they could allege that, honestly. And they don't allege that. Because I think they probably saved money on all these claims. And they know they did. Because, again, let's step back. This is a very sophisticated party that all they do is adjust and settle auto claims. They know what these procedures are worth themselves. They've got the records in front of them. The idea that, hey, we just took these bills and put the base value is not plausible on its face. They know how to adjust these bills. They know what procedures are worth, especially when they have the records that, again, they don't argue are false. They don't argue that anything in those medical records is not true. But also... So what you're saying... I'll give it a try. So let's say you have an auto claim that is presented to the insurer and the amount of the claim is $50,000 and that is based on the severe injury to the claimant and he had to have a CT scan or some medical procedure that costs a lot of money. And the insurance company settles for $100,000 saying, alright, well, we looked at that and that's $100,000. They come to discover later that the claimant never needed the procedure because he actually didn't have any such injury. Now, are you saying that that allegation, that he didn't actually have the injury and so didn't need the procedure, is not even present in this case? It is not present. Okay, not present. No one's alleging that there was no fraudulent inflation of the codes. None of that? They are alleging that a level of emergency code billing was charged that was not warranted by the facts in the record. Is that not just a complicated way of saying what I just said, which is he didn't need that? Well, I think it's a little bit different than what you said. He didn't need a CT scan. We're not talking about any particular treatment, modalities. We're talking about a way of coding the modalities they did. We're not saying that, hey, he didn't need an evaluation, he didn't need an image, he didn't need a nurse to look at. They're saying it was not sufficiently an emergency to warrant that code. What's the highest code? I saw in the briefing somewhere, CPT something. I believe it's, well, it's level 5 and I'm sure it's level 5. Okay, level 5. Can coding the level of emergency not be the subject of a fraud claim? I don't think so. When you have the facts in front of you, you can raise your own conclusions to what should properly have been coded. Does it affect the insurance settlement? I don't think it does. And it wouldn't be higher? It wouldn't be higher when Allstate knows when Allstate has a record in front of it, they have their own coding people who can look at the record and say this only warrants a level 4. And they're doing it now. Remember, they're not claiming there's any new evidence that they just discovered about what's in these records. They're not even claiming these records are wrong. Their entire basis for their argument that these codes are wrong is based on the records that they had at the time they settled the case. They're just taking the very same facts that they had when they settled the case and reaching a different conclusion from those same facts. They're not saying, well, we discovered now that these patients didn't have the injury. They're not alleging that. The only thing they're alleging that was concealed from them is we didn't disclose the lawyer referrals as though that's material to what was done. Or we didn't disclose that we acted beyond the scope of the licensing emergency group. So that affects what treatment was given. Of course, they had the facts anyway. They knew what licenses people have. It's public information. I think they knew what they did. Okay, Mr. Humphrey. We have your argument. We appreciate it. Thank you very much. Mr. Krasnow, you're back for a whopping five minutes. Can I ask you a question about unmanageability? So, even if we were to assume you're right on the law, how is a 635 claim or case, practically tried without devolving into hundreds of little mini-trials on medical necessity? Well, I will tell you based on my experience sitting through the plan back trial that part of it is expert testimony by medical experts that this entire pattern of treatment based on the circumstances just across the board was not warranted, did not rise to the level of emergency care. Part of it is adjusters in many cases who would have settled, would have handled dozens or more of these claims at issue coming in and testifying about what they did and how they settled. And so, a lot of it is across the board testimony. There are certainly, both parties go into specific instances about one claim or another when they think it How many claims or cases were at issue in plan back? So, we started out with 721 and by the time it got down to the trial that went to the jury, it was 555. So, we would have thrown that out if somebody had just thought to make the argument, well, it's unmanageable. Exactly. No, I think the answer is no. We probably wouldn't have done that because nobody ever raised that argument. So, yes, and so, in that case, it's what you would expect would happen. If there were problems with proof on some individual claims, the district court can throw those out at the summary judgment stage or the JMOL stage. You heard my, just shifting for a second, you heard my exchange with Mr. Humphrey at the end there where I gave a hypothetical that somebody made an insurance claim based on needing some very expensive procedure. Turns out it didn't need it. They knew they didn't need it, but they just fraudulently represented that and got a settlement based on it. And I was told that that kind of thing is not at issue in this case. Your response. We're not saying that treatment didn't occur, but we're saying that it was not needed because the only treatment that could be provided was emergency care and the circumstances of the people who came in indicated that they did not need emergency care. So, what's the nature of the fraud? Where's the fraud? It's not that the treatment, whatever it was, wasn't provided. You're saying it was, or at least that's the allegation. You're not alleging that it wasn't provided. It was provided, but it wasn't needed. Can you give me a specific example of that from the appendix? From the appendix? Do we have an appendix to the complaint? The appendix, it's more in the allegations of the complaint, is where the treatment was cookie cutter CT scans and things of that nature for people coming in weeks after the accident. And I think you have to look at the CPT codes for the fraud. That's a representation that the highest level of emergency care was being provided to these patients when the circumstances indicated it was not. You also have to look at this court in Torres versus SGE management discuss the invoice theory of reliance and how when you present an invoice to someone for payment. Mr. Humphreys is saying, if I understand it, is that your client had all the information, let's just say one case, all the facts about the case, a code, CPT code. You were settling it. You could have said, no, no, no, we're not going to settle for that. That wasn't needed for these facts. What's your response? He's saying you could have discovered if you had just gotten in there and dug hard enough, but this court has said in receivable finance that reliance need not be reasonable. I don't think you're looking at on a claim by claim basis whether it could have been discovered. What certainly couldn't have been discovered is the overall pattern of conduct that we were talking about. The fact that in 2018 new entities were set up to do the billings, that there was a radical change in the types of patients that were being seen and how they were being billed, the letters of protection, that was not something that was known to us. The medical records were provided, yes, but there was a lot that was not known. You can't discover a RICO pattern, a predicate mail fraud by looking at just one claim by one claim by one claim. It takes time and a pattern. What is your response to the assertion that you didn't adequately request leave to amend? Well, this is the first, their briefing did not cite any of the cases that he's mentioning about you have to do more than just ask for leave to amend. We said in our response, and it's page 325 of the record that we made our arguments for why we thought our complaint was adequate and then we said if the court thinks otherwise, we would request leave to amend and that was in, I think, in our prayer for the response too. So we did explicitly ask for it. The district court was required to give it to us unless some limited exception applied, which it doesn't here. So I'm not aware of cases saying that we had to say pretty please or that we had to, you know, file some sort of separate motion for leave or something to that effect. We clearly did ask for leave to amend. Okay. Thank you very much. We appreciate the able advocacy both in your briefing and at the podium today. We're grateful. And the case is submitted.